UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BLACK HILLS TRUCK & TRAILER, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MAC TRAILER MANUFACTURING, INC., and SIOUXLAND TRAILER SALES, INC., <br><br> Defendants. | Case No. 13-CV-4113 (KES) <br><br> ORDER DENYING MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Black Hills Truck & Trailer, Inc., brought this action naming MAC Trailer Manufacturing, Inc. and Siouxland Trailer Sales, Inc., as defendants. Black Hills alleges tortious interference with a present and prospective business advantage against Siouxland. Docket 46. Siouxland moves for summary judgment on Black Hills's claim of tortious interference. Docket 65.

**FACTUAL BACKGROUND**

The facts, viewed in the light most favorable to Black Hills, the non-moving party, are as follows:

Gary March owns Siouxland located in Sioux City, Iowa. Siouxland also has sites in Pacific Junction, Iowa and Harrisburg, South Dakota. Siouxland sells trailers made by four different manufacturers—MAC, Polar, Vanguard,

and Doonan. Docket 67 at 2. Black Hills is a truck and trailer dealership located in Rapid City, South Dakota. Docket 66 at 1. Black Hills is a subsidiary of North American Truck & Trailer, Inc., (NATT), which is owned by the Rush family in Sioux Falls, South Dakota. *Id.* Volvo Trucks of Omaha, Inc. (VTO) is a subsidiary of NATT located in Omaha, Nebraska. *Id.* NATT has dealer or service locations in various cities[1] across South Dakota, Nebraska, and Iowa. *Id.* MAC is a trailer manufacturer and Mike Conny is the owner, CEO, and President of MAC.

Siouxland and MAC entered into a Distributor Selling Agreement (dealer agreement) on November 22, 2010. Docket 73-1. The dealer agreement provided Siouxland with an Area of Responsibility (AOR) of the western two-thirds of Iowa and did not make any reference to an AOR in South Dakota or Nebraska. *Id.* Black Hills and MAC entered into a dealer agreement on September 26, 2012, that provided Black Hills with an AOR including seven South Dakota counties, twelve Nebraska counties, and a dealer location in Rapid City. Docket 67-6. Prior to signing the agreement, Steve Hallas, Vice President of Sales for MAC Trailer Manufacturing, clarified with Mike Rush, Vice President of NATT, that he could only have MAC trailers at the Rapid City location and that Rush could not "put any trailers in the Sioux land [sic] AOR!" Docket 67-13. On December 26, 2012, March learned that MAC had entered into an agreement with Bill Rush, President of NATT, for Bill Rush to set up an

---

[1] Sioux Falls, South Dakota; Rapid City, South Dakota; Watertown, South Dakota; Omaha, Nebraska; Sioux City, Iowa; Lexington, Nebraska; Tekamah, Nebraska; West Point, Nebraska; and Commerce City, Colorado.

MAC dealership in his Rapid City, South Dakota store. Docket 66 at 2. That same day, March sent an email to Steve Hallas, Vice President of Sales for MAC Trailer Manufacturing, stating, "Gentlemen, my blood pressure can't get any higher than it is right now after reading you set up Bill Rush of Black Hills Trailer. If I see he has taken us out of one deal I will find a new supplier [sic] Do not take this as a threat it is a promise. I hope you did not set them up with Tanks." Docket 67-7. Hallas responded "Gary I thought you and I talked about this this morning? I told you nothing would be done that Tom L and I would go over it on Tuesday? So why the emails now?" *Id.*

On January 9, 2013, March sent another email to Hallas regarding Rush stating "Interesting visit today from Ken Willcox president of Delta-Waseca Inc., Truck body mfg. Seems they have been sued by the Rush family for bogus product claims, [sic] Company has been around forever, [sic] Inherited the Omaha store when Rush bought it. Sold to them because of the previos [sic] owners the next thing the bodies show up at his other dealerships, making some very un happy [sic] dealers such as their Sioux Falls Dealer Northern equipment co . . . ." Docket 67-8. March then provided a phone number for Hallas to call Willcox. *Id.*

On May 28 or 29 of 2013, an employee of March's Harrisburg, South Dakota location informed March that there were MAC trailers on the sales lot of NATT's Sioux Falls, South Dakota location. Docket 66 at 3. March then went to

3

Sioux Falls and observed a stack[2] of MAC trailers and two more trailers on top of each other. Docket 67-3 at 16. March then called Hallas to complain that Black Hills was displaying MAC trailers in Sioux Falls for the purpose of selling them. *Id.* at 17. Black Hills denies that it stocked MAC trailers in Sioux Falls with the purpose of selling them. Docket 70 at 6. On May 29, 2013, Hallas and Conny talked about Black Hills and agreed that the Black Hills dealer agreement should be cancelled. Docket 67-9; Docket 70 at 9.

On May 30, 2013, March sent Hallas another email stating "let me give some insight why I have trouble with Rush Companies" and then detailed several reasons March has trouble with Rush companies. Docket 67-9. The final reason stated, "Now MAC trailers are showing up in Sioux Falls." *Id.* Hallas then responded that "It was made very clear to Mike Rush that he couldn't do what has happened. Mike Conny and I have talked briefly yesterday and we both feel that Black hills should be canceled for doing what they did." *Id.* And March replied stating, "Do not cancel Rush wait till his year runs out he will sue you I am sure of that, I don't want MAC hurt." *Id.* And then March gave Hallas the name of a different potential dealer in Rapid City. *Id.*

A few days later, Hallas sent Mike Rush an addendum stating that MAC would like to issue an amended dealer agreement to Black Hills under several conditions. Docket 67-10. The conditions were: Black Hills would be permitted to sell only Dump and Flatbed trailers; Black Hills could only stock trailers at

---

[2] A "stack" of trailers refers to three trailers. Docket 67 at 5.

the Rapid City location; Black Hills would not be permitted to stock trailers in any other location for any reason; Black Hills would not be permitted to advertise the MAC product line in any advertisement other than the Rapid City advertisements; and Black Hills could only sell out of the Rapid City location and north or south of Rapid City but not east of Rapid City. *Id.* In reference to the five restrictions, the addendum also stated that "In the event that any of this happens your dealer agreement with Mac Trailer will be cancelled. If you understand and agree with this please sign and return." The addendum also included the amended dealer agreement dated June 3, 2013, and signed by Mike Conny. *Id.* The amended dealer agreement provided that Black Hills would forfeit its twelve-county AOR in Nebraska.

On June 24, 2013, Hallas sent Mike Rush a letter stating that "MAC Trailer will not be able to accept any orders placed by Black Hills Truck and Trailer until the adjusted dealer agreement and addendum sheet is signed and received by MAC Trailer." Docket 67-11. On June 26, 2013, Hallas emailed LaGiglio directing him not to build any trailers for Black Hills because Hallas had not received the signed amended dealer agreement and addendum, and he did not want to sell Black Hills any more product until Black Hills signed the new agreement. Docket 73-6. On June 27, 2013, Mike Rush sent an email to Hallas and LaGiglio confirming that Black Hills had received the amended dealer agreement and additional letters but that Black Hills was not going to sign the agreement and was "going to stick with the current dealer agreement."

5

Docket 67-15. LaGiglio then emailed Hallas stating "How do you want to handle this clown?" Docket 73-7.

On July 2, 2013, Black Hills's attorney sent a letter to Hallas. The letter stated that Hallas's June 24, 2013 letter constituted an "immediate termination of the [dealer agreement] without notice and good cause, and is prohibited by South Dakota law." Docket 67-14. The letter then stated that Black Hills would not agree to the new terms demanded by MAC and that the agreement must be enforced according to its original terms including allowing Black Hills to "sell tank-type trailers to customers that desire such products, or other MAC trailer models as requested by customers." *Id.* The letter then explains that if MAC would not agree, Black Hills would file a civil action. *Id.*

On July 19, 2013, MAC's attorney sent a letter to Black Hills's attorney in response to the July 2, 2013 letter. Docket 73-8. The letter stated that it served "as notice that MAC will not renew the Dealer Agreement for calendar year 2014, beginning January 1, 2014, and any year thereafter." *Id.* On March 25, 2014, LaGiglio emailed Gary March proposing to grant Siouxland an AOR including the part of Nebraska that had formerly been under Black Hills's AOR. Docket 70 at 11.

## DISCUSSION

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." (internal quotations omitted)). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

Once the moving party meets its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). For purposes of summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).[3]

---

[3] According to local civil procedure rules, a movant's "statement of material facts will be deemed to be admitted unless controverted by the opposing party's

## I. Applicable Law.

Black Hills alleges tortious interference with a present and prospective business advantage against Siouxland. In an action based on diversity of citizenship, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-law rules. *Drinkall v. Used Car Rentals, Inc.*, 32 F.3d 329, 331 (8th Cir. 1994). So this court will apply South Dakota's conflict-of-law rules to determine which state's tortious interference laws will govern.

"South Dakota applies the provisions of the Restatement (Second) of Conflicts of Laws in order to resolve questions about which state's laws govern in a particular factual situation." *Stockmen's Livestock Exch. v. Thompson*, 520 N.W.2d 255, 257 (S.D. 1994). For tort claims, South Dakota applies the most significant relationship analysis set forth in the Restatement (Second) of Conflict of Laws. *Burhenn v. Dennis Supply Co.*, 685 N.W.2d 778, 784 (S.D. 2004). The following contacts between the parties are considered when evaluating which state has the most significant relationship: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and; (d) the place where the relationship, if any, between the parties is centered. *Id.* (quoting Restatement (Second) Conflict of Law § 145 (Am. Law Inst. 1971)).

---

response to the moving party's statement of material facts." D.S.D. Civ. L.R. 56.1(d).

Also, the principles to be taken into account when applying the most significant relationship test are:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result; and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6 (Am. Law Inst. 1971).

Here, Black Hills alleges that Siouxland injured Black Hills when March sent multiple emails to MAC detailing reasons why MAC should not do business with the Rush family and called MAC to complain that Black Hills was violating its dealer agreement, which ultimately led to MAC terminating its agreement with Black Hills. Docket 71 at 8-9. While March and Siouxland are primarily located in Iowa, Black Hills is located in South Dakota. Thus, the prohibited conduct—March contacting MAC about Black Hills—likely occurred in Iowa, and the injury occurred in South Dakota. Black Hills is a corporation organized in South Dakota, Siouxland is a Nebraska corporation, and MAC is an Ohio corporation. Docket 46 at 1-2. So the third factor does not weigh in favor of either South Dakota or Iowa. Finally, the relationships between Black Hills, MAC, and Siouxland centered in South Dakota, Iowa, and Nebraska

9

because Black Hills was located in South Dakota and was granted an AOR that included western South Dakota and parts of Nebraska while Siouxland's AOR with MAC only included western Iowa. Weighing the various contacts to this claim, South Dakota and Iowa both have a similar degree of relationship—South Dakota is where the harm occurred and Iowa is where the conduct took place.

Applying the principles set out in section 6 of the Restatement, Iowa and South Dakota both have similar laws governing tortious interference with a business relationship. *See Gen. Elec. Capital Corp. v. Commercial Servs. Grp., Inc.*, 485 F. Supp. 2d 1015, 1025-26 (N.D. Iowa 2007); *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992). So the policies of the forum, South Dakota, and the policies of the other interested states, Iowa, are similar as well as the uniformity of result and ease of determination of law to be applied. *See* Restatement (Second) Conflict of Laws § 6. One principle that weighs in favor of South Dakota is the protection of justified expectations. "In general, the tort of intentional interference with contractual relations serves as a remedy for contracting parties against interference from outside intermeddlers." *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 404 (S.D. 2008). Here, Black Hills alleges that Siouxland unjustifiably interfered with Black Hills's expectation of business with MAC, and South Dakota has an interest in protecting the business interests of its residents within its state. Thus, weighing the contacts of the parties and the choice-of-law principles, South

Dakota has the most significant relationship, and South Dakota law will apply to the tortious interference claim.

II.  **Siouxland's Motion for Summary Judgment on Claim of Tortious Interference with a Business Relationship or Expectancy.**

In South Dakota, the elements of a tortious interference with business relationships or expectancy claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and improper act of interference on the part of the interferer;[4] (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. *Tibke*, 479 N.W.2d at 908. The South Dakota Supreme Court has analogized this cause of action to "a 'triangle' [involving] a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Landstrom v. Shaver*, 561 N.W.2d 1, 16 (S.D. 1997). This is a "factually driven cause of action" and is "dependent on the plaintiff's factual situation." *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 250 n.6 (S.D. 1999).

   **A. Siouxland's Intent.**

Siouxland argues that there is no evidence that it intended to have Black Hills's dealership agreement cancelled but that "the sole intent of Gary March was to see to it that the only person who stocked MAC trailers in his AOR was

---

[4] The South Dakota Supreme Court previously described the third element as involving "unjustified" interference, which was recently modified to require a showing of "improper" interference. *See Gruhlke*, 756 N.W.2d at 408.

11

Siouxland." Docket 67 at 10-11. To succeed on a claim for tortious interference of a business relationship, Black Hills has to prove that Siouxland's actions were intentional. *Selle v. Tozser*, 786 N.W.2d 748, 753 (S.D. 2010). An action is intentional where the actor "knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766 cmt. j (Am. Law Inst. 1979). Thus, the question is whether Siouxland knew that the interference of the Black Hills-MAC relationship was certain or substantially certain to occur as a result of its actions. *Kjerstad v. Ravellette Publ'ns., Inc.*, 517 N.W.2d 419, 429 (S.D. 1994). Additionally, questions surrounding a party's intent or state of mind are typically questions of fact for the jury and not suited for summary adjudication. *Ahl v. Arnio*, 388 N.W.2d 532, 534 (S.D. 1986). Likewise, a person's description of his state of mind implicates his credibility, which is also an issue for the jury to consider. *Weidner v. Lineback*, 140 N.W.2d 597, 601 (S.D. 1966).

Here, beginning in December of 2012, March sent multiple emails to MAC detailing reasons why MAC should not do business with Black Hills or the Rush family. The December 26, 2012 email stated that Siouxland would find another dealer if Bill Rush took Siouxland out of even one deal. The January 9, 2013 email informed MAC about ongoing litigation between the Rush family and another manufacturer. And the May 30, 2013 email listed multiple reasons why March has "trouble with Rush Companies." Dockets 67-7, 67-8, 67-9. The listed reasons detailed instances where Rush allegedly engaged in fraudulent or otherwise underhanded behavior. Dockets 67-8; 67-9. March also called Hallas

12

on May 28 or 29 to complain about Rush's Sioux Falls location stocking MAC trailers. Docket 67-3 at 16. Ultimately, MAC terminated Black Hills's dealer agreement, and MAC eventually offered Black Hills's original Nebraska AOR to Siouxland. Docket 73-9. There is evidence that March sent emails and called MAC regarding Black Hills and that March's actions may have affected the business relationship between Black Hills and MAC. Also, there is evidence that Siouxland ultimately benefitted from the breakdown of Black Hills's and MAC's business relationship and that March disliked Bill Rush. Thus, there is a genuine question of fact for the jury to decide as to Siouxland's intent behind its contact with MAC.

### B. Siouxland's Improper Interference.

Siouxland argues that it did not act improperly because the series of emails March sent to MAC "were nothing more than venting" and that "all he wanted to accomplish was to keep other dealers from stocking or setting up the sale of MAC trailers in his area of responsibility." Docket 67 at 12. The Restatement (Second) of Torts § 767 lays out the following factors to consider when determining if an actor's conduct is improper:

>    (a) the nature of the actor's conduct;
>    (b) the actor's motive;
>    (c) the interests of the other with which the actor's conduct interferes;
>    (d) the interests sought to be advanced by the actor;
>    (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
>    (f) the proximity or remoteness of the actor's conduct to the interference; and
>    (g) the relations between the parties.

13

Restatement (Second) of Torts § 767 (Am. Law Inst. 1979).

"What constitutes improper interference will depend on the particular facts of each case with consideration of the elements above." *Gruhlke*, 756 N.W.2d at 408. In *St. Onge Livestock Co., Ltd. v. Curtis*, 650 N.W.2d 537, 542 (S.D. 2002), the South Dakota Supreme Court indicated that the question of whether or not a party's conduct is improper is a question of fact for the fact finder. *St. Onge Livestock Co., Ltd.*, 650 N.W.2d at 542 (citing *Q.E.R. v. Hickerson*, 880 F.2d 1178, 1183-84 (10th Cir. 1989) (stating that balancing the factors to determine whether conduct was improper is a question for the fact finder); *Hennum v. City of Medina*, 402 N.W.2d 327, 336 (N.D. 1987) (stating that whether interference is justified is a question of fact)).

Here, March sent multiple emails to MAC expressing his dislike for the Rush family, promising that he would find a new supplier if Rush took Siouxland out of a deal, and detailing a list of reasons why he has "trouble" with the Rush companies. Dockets 67-7, 67-8, 67-9. March also called Hallas to complain about Rush stocking MAC trailers in Sioux Falls. Docket 67 at 5. And March admits that "[t]he relationship between Gary March and Bill Rush was not good" and that they had a long history of having "trouble" with each other. *See* Docket 67 at 5. March argues that his conduct was not improper because he was simply ensuring that Black Hills was complying with its dealer agreement and not stocking MAC trailers outside its AOR. Docket 67 at 12. But Black Hills contends that Siouxland's interference was improper because

March was taking out a personal vendetta against Rush. Docket 71 at 9. The court must view the facts in the light most favorable to Black Hills and draw all reasonable inferences in its favor. The court finds that March's multiple emails to MAC implying that Bill Rush engaged in fraudulent behavior as well as March's admission that he does not have a good relationship with Bill Rush raises a question of fact as to whether his interference with MAC and Black Hills's business relationship was improper.

### C. Causation.

Siouxland argues that there is no evidence to support that March's complaints about Black Hills to MAC caused MAC to terminate its dealer agreement with Black Hills. Docket 67 at 13. To prove a claim for tortious interference of a business relationship, Black Hills must show that Siouxland's actions were a legal cause of Black Hills's injury. *St. Onge Livestock Co.*, 650 N.W.2d at 542. Legal cause means "an immediate cause which, in the natural or probable sequence, produces the injury complained of. For legal cause to exist, the harm suffered must be a natural and probable sequence of the act complained of." S.D. Pattern Jury Instruction (Civil) 20-10-20. In South Dakota, "[i]ssues of . . . proximate cause are ordinarily questions of fact." *Mitchell v. Ankeny*, 396 N.W.2d 312, 313 (S.D. 1986).

March sent several emails to MAC complaining about Rush companies and Black Hills. Included in the emails were accusations that Bill Rush had engaged in underhanded behavior in the past, (Docket 67-9), and provided

15

contact information for MAC to call other manufacturers who, allegedly, had problems with Rush companies. *See* Docket 67-8 (providing Hallas with a phone number to call another manufacturer about its lawsuit with the Rush family). Also, March called Hallas on May 28 or 29 of 2013 and told Hallas that Black Hills was violating its AOR by stocking trailers in Sioux Falls. Docket 67-3 at 17. On May 30, 2013, Hallas stated in an email that Black Hills should be terminated. Docket 67-9. Thus, viewing the evidence in the light most favorable to Black Hills, there is evidence that Siouxland's actions caused MAC to terminate its agreement with Black Hills, and it is a question of fact for the jury to decide.

## CONCLUSION

In conclusion, the court finds that whether Siouxland intentionally and improperly interfered with Black Hills's relationship with MAC and whether the interference caused MAC to terminate its dealer agreement with Black Hills present questions of fact for the jury. Thus, it is

ORDERED that Siouxland's Motion for Summary Judgment (Docket 65) is denied.

DATED August 28, 2017.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE